## BROTHERS v. LIDGERWOOD MFG. CO.

(Circuit Court of Appeals, Second Circuit.   March 9, 1915.)

No. 161.

1. PATENTS &#8594;276—QUESTIONS OF LAW AND FACT—CONSTRUCTION OF PATENTS.

When the validity of a patent is to be determined, and its claim construed by reference to prior patents about the dates and authenticity of which there is no controversy, the trial judge will usually construe such patents as he would other documents, and by doing so he does not invade the province of the jury.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 240, 432–434; Dec. Dig. &#8594;276.]

2. APPEAL AND ERROR &#8594;927—REVIEW—APPEAL FROM JUDGMENT ON DIRECTED VERDICT.

On appeal in a patent infringement suit from a judgment on a directed verdict for defendant, where there was a conflict in the evidence as to an alleged prior use and the operation of the alleged infringing structure, complainant's version of the facts will be accepted as correct.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 2912, 2917, 3748, 3758, 4024; Dec. Dig. &#8594;927.]

3. PATENTS &#8594;328—VALIDITY AND INFRINGEMENT—CABLE CRANE WITH GRAVITY ANCHOR.

The Brothers patent, No. 551,614, for a cable crane with a gravity anchor, consisting of a tilting anchorage tower, from which a counter weight is suspended, to take up the slack of the cable, *held* valid, but not infringed by certain cable ways as constructed by defendant for the United States government.

4. PATENTS &#8594;178—CONSTRUCTION—PIONEER INVENTIONS.

Where an invention is broadly new, and is a pioneer in its field, the patent therefor is entitled to a broad construction, and the claims to a liberal application of the doctrine of equivalents.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 254½;  Dec. Dig. &#8594;178.]

5. PATENTS &#8594;178—CONSTRUCTION—EQUIVALENTS.

The Brothers patent, No. 551,614, for a cable crane with a gravity anchor, consisting of a tilting anchorage tower with a counterweight suspended therefrom to take up the slack of the cable, claimed a combination including a gravity anchor at one end of the cable, consisting of an inclined "sheers" with the cable attached thereto and a weight hung permanently from the sheers upon the opposite side to the cable. *Held*, that a post or some similar structure, producing substantially the same result in substantially the same way as the sheers, was within the range of reasonable equivalency.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 254½;  Dec. Dig. &#8594;178.]

6. PATENTS &#8594;328—CONSTRUCTION—"HUNG PERMANENTLY"—"GRAVITY ANCHOR."

The words "hung permanently" should be given a reasonable construction, and should not be so construed as to prevent a structure in which the counterweight, when all the slack in the cable is taken up, rests on the ground, instead of swinging free, constituting an infringement; the anchor not hereby ceasing to be a "gravity anchor," as gravity still gives it power to hold the load on the cable.

7. PATENTS ☜266—INFRINGEMENT—PERSONS LIABLE.

Where certain cableways constructed by defendant for the United States government, and thereafter operated by the government, did not, as constructed by defendant, infringe complainant's patent, defendant was not responsible, as a direct or contributory infringer, for changes subsequently made by the government.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 410; Dec. Dig. ☜266.]

In Error to the District Court of the United States for the Southern District of New York.

This cause comes here upon writ of error to review a judgment of the District Court, Southern District of New York in favor of defendant in error, who was defendant below. The action was at law for alleged infringement of letters patent No. 551,614 granted December 17, 1895, to plaintiff, for a cable crane with gravity anchor.

W. F. Brothers, in pro. per.

Livingston Gifford, Leavitt J. Hunt, George W. Betts, Jr., and Charles S. Jones, all of New York City, for defendant in error.

Before LACOMBE, COXE, and ROGERS, Circuit Judges.

LACOMBE, Circuit Judge. At the close of the trial the court directed a verdict for the defendant. After it had been announced that this disposition would be made of the case, the court at the request of the complainant charged the jury and told them to bring in a verdict, apparently on the theory that if it were for defendant it would end the case, but if it were for the complainant it would be set aside and verdict directed as had been indicated. The jury disagreed; thereupon verdict was directed. These superfluous proceedings are of no importance. If the condition of the cause was such when the testimony closed that verdict should have been directed for defendant without passing on any disputed question of fact, the judgment should be affirmed; otherwise it should be reversed.

[1, 2] It is well settled that when the validity of a patent is to be determined and its claim construed by reference to prior patents, about the dates and authenticity of which there is no controversy, the trial judge will usually construe those documents as he would other documents; his doing so does not invade the province of the jury. There may be exceptional cases, but this is not one of them. The first questions, therefore, for this court to determine, are whether, in view of the prior art patents, the one in suit is valid, and what is the scope of its claims. Besides the prior patents, there was an alleged prior use at the Chicago drainage canal, but as to what that was there was conflicting testimony; therefore it must be assumed that complainant's account of it is correct, and we cannot consider it either as impairing the validity of the patent or as in any way affecting the construction of its claims.

On the question of infringement there seems to be no question as to what the structure was which defendant erected on the line of Panama Canal; as to the operation of that structure there is a conflict of

testimony, and we must here assume the complainant's version of such operation to be correct.

[3] The patent is for an improvement in cable cranes with gravity anchors. The following drawings will make the description more intelligible:

The object of the invention, as stated in the specifications, is to facilitate the erection and operation of a suspension cable, and consists in—

"combining a tension weight upon the end of the cable with an inclined sheers or post adapted to transform the vertical tension of the weight into a horizontal tension upon the cable. * * * By inclining the sheer poles and weighting their upper ends the tension of the cable is converted into a thrust at the lower ends of the sheers; but I have termed the device a 'gravity anchor,' as it depends for its efficiency entirely upon the operation of gravity."

In the drawings $A$ is the cable, $D$ the inclined sheer poles or post, $H$ the load in the carrier which travels on the cable, and $F$ the weight upon the end of the cable. The sheers are set at an angle of preferably 45 degrees to the cable.

"With the sheer posts set at this angle, the weight of the poles, if permitted to yield, exerts a very material tension upon the cable independently of the tension weight, and the latter may be proportioned to produce the additional tension required to strain the cable in the required degree. * * * It is well known that the tension at the ends of a suspending cable is much greater with a given load at the middle of the cable than when the load is close to either abutment, and my improved anchorage varies the angle of the cable in proportion to the load, if the sheer poles be so made as to support the load and also yield under variations of the tension."

Referring to Fig. 7 the patentee says:

"Fig. 7 illustrates in diagrammatic form the changes of angle in the cable, the parts being indicated in solid lines with the load in the middle of the cable, and in dotted lines with the load close to the sheer poles. In the lat-

ter position the slack of the cable is partially taken up by the tension-weight and the sheer poles are bent outwardly from the fixed abutment, thus holding the cable at a smaller angle with its abutment than would be the case if the sheer poles were rigidly fixed and the slack of the cable were unchanged during the shifting of the load. I have found that with the use of the flexible sheer poles and the tension weight G, the angle of the cable to the horizontal line at the cap E is substantially the same for all positions of the load, as is indicated by the parallelism of the full lines and dotted lines adjacent to the cap E."

The specification further states:

"The operation of the tension device in automatically taking up the slack of a suspended cable, when the load approaches the supports, enables me to move the load much closer to the supports, with the same degree of power, than has heretofore been possible. Where the cable supports are rigidly fixed, the inclination of the cable adjacent to the support is materially increased when the load approaches such support, and the power required to propel the carrier up such inclined portion toward the support is four or five times greater than is necessary to move the load over other portions of the cable.

"By the use of my automatic tension device the angle of the cable is kept nearly the same throughout the movement of the load toward the supports, and the angle adjacent to the support, when the load is at such point, is no greater than when the load is in the middle of the cable. * * * By transporting the load close to the supports at both ends of the cable I am enabled to utilize the entire length of the cable with a moderate exertion of power, which has not heretofore been possible."

The claims relied on are these:

"1. The combination, with a suspended cable, a carrier to support a load movably upon the cable and means for propelling the carrier thereon, of a stationary support or anchor at one end of the cable and a gravity anchor at the opposite end of the cable, consisting of an inclined sheers with the cable attached thereto, and a weight hung permanently from the sheers upon the opposite side to the cable, as and for the purpose set forth."

"2. The combination, with a suspended cable, a carrier to support a load movably upon the cable and means for propelling the carrier thereon, of a fixed anchor at one end of the cable, and a gravity anchor at the opposite end of the cable, consisting of inclined sheer poles braced toward one another and united at the top, and a weight hung permanently from the sheers upon the opposite side to the cable, as and for the purpose set forth."

"3. The combination, with a suspended cable a carrier to support a load movably upon the cable and means for propelling the carrier thereon, of a fixed anchor at one end of the cable, and inclined sheer poles held movably at the base so as to yield with variations of load upon the cable, with the cable attached to the top of said sheers, and a weight hung permanently from the sheers upon the opposite side to the cable, as and for the purpose set forth."

No claim, other than the first, which is the broadest one, need be considered. The description above quoted is so full and clear that Brothers' improvement is readily understood. He provided an anchorage tower—whether sheers, post, or other structure is immaterial—which would tilt when the cable crane was in operation. When the load (carrier) was in the center of the cable, the latter would pull strongest at the top of the tower; to that strain the tower would yield, towards the load. As the load drew nearer the tower, the pull of the cable would relax, and the counterweight would gradually take up the slack tilting the tower away from the load. Load and counterweight are so proportioned that, during operation, there is this constant tilting

back and forth. The advantages secured thereby are clearly pointed out.

Turning now to the patents of the prior art—and they are many—it is evident that this arrangement is broadly new; no cable crane shown in them works that way. The patentee testified that his method was revolutionary; that other engineers laughed at him when he suggested it. Before his suggestions both tower anchorages were constructed so that they would remain rigid. This rigidity was secured sometimes by one means, sometimes by another, sometimes by a combination of means. Bases were made broad, or were firmly imbedded in the ground, or the towers were anchored by chains or rods to dead-eyes set off at an angle, or the bases were clamped down, or counterpoise weights were so affixed to the towers that no load weight under which the crane was operated could lift them. The top of the tower to which the cable ran could tilt neither inwards nor outwards. Defendant's expert, referring to some of the patents (Pluchet, Sassiat) speaks of the tower *yielding* to the strain of the cable, but a reading of these patents shows that this is merely the usual easy assumption of the expert; each patent indicates as plainly as language can that the tower is to be so secured that, in operation, it will remain rigid, except, of course, for the minute elasticity of the wood, or steel, or other materials with which it is constructed. It may be that the art sought to avoid tilting because it feared it, dreading lest a tilt might prove but the initial step to a collapse. But whatever may have been the purpose of their builders, the structures of the prior art as disclosed in its patents were so built that they would not tilt in operation. Of course, with all of them it is quite conceivable that an overload might be applied to the middle of the cable, so great that (if the cable would stand the strain) it might tear out dead-eyes, or break connecting chains or rods, or straighten out holding clamps, or lift the counterpoise weights. But this would involve an abuse, not a use, of the structure; Brothers was the first to devise a structure whose use involved constant tilting back and forth.

Manifestly his patent is valid.

[4] Moreover, since the invention is broadly new, is a pioneer in the field of tilting anchorages for cable cranes, the patent is entitled to a broad construction, and the claims to a liberal application of the doctrine of equivalents.

[5, 6] One element of the claims is a "gravity anchor," which the claim itself defines as consisting of "an inclined sheers with the cable attached thereto, and a weight hung permanently from the sheers upon the opposite side to the cable." Certainly the patentee should not be confined to "sheers"; a post, which he suggests in the specification, or some similar structure which will produce substantially the same results in substantially the same way, is within the range of reasonable equivalency. The weight shown in the drawings and description consists of a mass of stones or sand bags piled up in a bucket which is swung by chains from the top of the sheers. The claim is certainly not avoided by the simple expedient of substituting a mass of concrete for the stones and sand and rigid rods for the chains. As shown in

drawings and description, the weight always swings free at some distance above the ground. It is therefore contended that the phrase "hung permanently" so restricts the claim that the structure complained of—even if it be conceded, which it is not, that the tower tilts—does not infringe because the weight is sometimes in contact with the ground. The words "hung permanently" must be given a reasonable construction in view of what the patent discloses, viz., an "anchor," whose holding power is due to the action of gravity, and which is raised or lowered as it yields to a greater strain, or overcomes a lesser one. When it is thus yielding, it is, of course, off the ground; it is also off the ground when it is taking in the slack of the cable, as the strain of the load grows less. There comes a time, however, when the strain of the load has reached its lowest limit, when there will be no more slack to take up. If at that moment it reaches the ground, it does not cease to be a gravity anchor; gravitation is giving it the power to hold, and it continues to hold at the lowest limit of opposed strain as effectually as if it were swinging five feet up in the air. We think it a strained construction which would hold that an anchor which acts in this way does not infringe because at the moment when all the slack is taken up it is not swinging free, although its weight is firmly holding, against load, all the slack thus taken up.

The infringement alleged is found in certain cableways, complete with towers, cables, rope for hoisting, conveying, dumping, etc., buckets, motors for hoisting, conveying, and accessories, which were installed by defendant for the United States government on the line of the Panama Canal. The work was done under a contract which is in evidence and which minutely specifies the details of the entire structure and its appurtenances. It was completed in July, 1909, and after official tests was accepted by the government in August, 1909. Thereafter it was operated by the government for about two years; defendant's operation consisted merely of what was needed as a demonstration to satisfy the government that the contract had been properly carried out. The following sketch sufficiently indicates the structure installed.

Fig. 5

Each tower rests on a trackway along which it can be moved; the portion indicated by the heavy line inclined at an angle of about 45 degrees is contended to be equivalent of the sheers, the "weight" indicated at $H$ is a mass of concrete rigidly connected with the top of the tower. It is the contention of plaintiff that in operation the load (in the carrier) when in the center of the cable produced such a tension on the cable that the top of the tower was pulled over inwards and the weight lifted, and that as the load moved towards the abutment the

weight settled down again, taking up the slack. In other words that the tower became a tilting one, with a gravity anchor, substantially like the one shown and claimed in the patent. On this branch of the case there was conflicting testimony, but, inasmuch as defendant did not operate the cableway, testimony as to what the user did with the structure defendant built will not necessarily affect the latter, unless it can be shown that it contributed to an infringing use. If plaintiff's patent be a valid one, with claims covering broadly a tilting tower in which a gravity anchor alternately yields and overcomes load—as we think it is —and it be further shown that the user of the Panama structure so used it as to infringe the patent, a suit could be maintained against such user if a private party. Since it is the government, relief could be obtained only in such way as the statutes may provide; but it must be assumed that the owner of a meritorious invention which the government has appropriated without his consent will be in some way compensated, if he can prove his case by satisfactory proof.

[7] This suit, however, is brought only against the builder of the Panama structures, and we are concerned only with the structure as it was built. There seems to be no dispute that it was built in conformity with the provisions of the contract. Those provisions indicate that neither head nor tail tower was constructed so as to operate as does the tower of the patent; they more nearly approached the towers of the prior art. Like some of those towers, each tower was made rigid, not by dead-eyes, or clamps, but solely by the weight of its counterpoise, the concrete block $H$. Defendant was advised by the specifications for the contract what would be the limit of the load on the cable which it was to provide for. Careful calculations made therefrom indicated what weight there should be in the concrete mass to enable it to hold the tower rigid against any pull of the cable induced by any and every position. The weight of the concrete counterpoise in each tower was so much in excess of whatever it might be called to meet in operation that absolute rigidity of the tower was assured. Moreover the structure installed was complete in all its parts; it included all the necessary motors and in the proper motor there was an automatic cut-off which would stop the motor should it be attempted to put an overload on the cable. Not only is there no evidence that defendant ever tilted these towers in operation, but on the contrary it appears that the structure it installed could not be operated so as to put enough load on the cable to tilt the towers, because the control panel of the motors would throw out the current. There was nothing to indicate to defendant that the government intended to make changes in the structure, or to operate it otherwise than as planned. The statements in the specifications as to carrying capacity and provision for automatic cut-outs indicated the contrary. For the subsequent action of the government in eliminating or altering the cut-outs and in greatly increasing the specified carrier load, trying to counterweight it by some additional concrete—assuming that the proof shows, as plaintiff contends, that the government did so—defendant is not responsible, either as a direct or as a contributory infringer.

The judgment is affirmed.